UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

**Case No. 12-23304-CIV-MORENO (formerly Rosenbaum)**

**GUILLERMO OCTAVIO ARBELAEZ,**

      Petitioner,

vs.

**MICHAEL D. CREWS,** Secretary,
Florida Department of Corrections,

      Respondent.

_____/

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

In 1988, Petitioner Guillermo Arbelaez was sentenced to death for kidnapping, strangling, and throwing over a Key Biscayne bridge into the water 75-feet below the 5-year old son of a woman in revenge for her rejection of his romantic advances. After two decades of post-conviction litigation in Florida state courts, the Petitioner claims that his execution is impermissible because he is intellectually disabled and that his trial counsel was ineffective. The State of Florida argues that the September 2012 federal petition is untimely and should be denied. The Court holds that, although the federal petition should have been filed no later than April 4, 2006, the State has waived its timeliness objection. However, the Court denies the petition on the merits, finding the Florida Supreme Court's determination that Petitioner was not intellectually disabled and that he suffered no prejudice by any alleged ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law.

## I. FACTUAL BACKGROUND

Petitioner Arbelaez seeks to vacate the death sentence imposed upon him for the 1988 murder of Julio Rivas, the 5-year old son of Graciela Alfara.   Arbelaez rented a room in a Miami house he shared with Ms. Alfara and her 5-year old son, two teenaged daughters and a 19-year old cousin.   Arbelaez had an intimate relationship with Ms. Alfara, but that ended when she accused him of touching one of her daughters.   Ms. Alfara began seeing other men causing Arbelaez to say that he would do something that would assure "that bitch is going to remember me for the rest of her life."   Arbelaez kidnapped Ms. Alfara's son, strangled, bruised, and threw him from a bridge in Key Biscayne, Florida.   Arbelaez confessed to a friend that he did so as revenge against the mother.   Arbelaez obtained an airline ticket to Puerto Rico under an assumed name and eventually fled to Colombia.   After obtaining monetary wire transfers from his family, he returned to Miami. He waived his Miranda rights and gave two statements admitting that he killed the child as a plan of revenge against the mother.[1]   At trial, Arbelaez, contrary to his three prior statements, testified that the child's death was an accident, and not an intentional killing.

After his conviction, Arbelaez was sentenced to death and subsequently filed an appeal, and several post-conviction motions in state court.   On September 11, 2012 Arbelaez filed this federal habeas corpus petition under 28 U.S.C. § 2254.   The case was assigned to Judge Robin Rosenbaum and later transferred to the undersigned upon Judge Rosenbaum's elevation to the Eleventh Circuit Court of Appeals.

The State of Florida argues that Arbelaez's petition is time-barred.   Arbelaez claims that his execution would violate the United States Constitution because of his intellectual disability.

---

[1] A complete summary of the salient facts has been set out by the Florida Supreme Court in *Arbelaez v. State*, 626 So. 2d 169 (Fla. 1993) and included as an exhibit to this order.

Petitioner further alleges that his court-appointed attorney rendered ineffective assistance of counsel at both the guilt and penalty phases of his trial. For the reasons further discussed below, the Court holds that the State of Florida has waived the timeliness argument, but also finds Arbelaez's petition should be dismissed on the merits because he has not met his considerable burden under § 2254(d).   The Florida Supreme Court's determinations were not contrary to, or an unreasonable application of clearly established United States Supreme Court law.

## II. PROCEDURAL HISTORY

On April 27, 1988, Petitioner Arbelaez was charged by indictment in Miami-Dade County with first degree murder and kidnapping of 5-year old Julio Rivas.   On February 19, 1991, the jury found Arbelaez guilty. *Arbelaez v. State,* 626 So. 2d 169, 174 (Fla. 1993). After the penalty phase, the jury recommended a death sentence by a vote of eleven to one. *Id.* at 175.   The trial judge found three aggravating factors[2] and two mitigating factors.[3]   After weighing the aggravating and mitigating circumstances, the court sentenced Arbelaez to death.   On direct appeal, the Florida Supreme Court affirmed the conviction and sentence and found that: (1) the defendant was not in custody when he had telephone conversations with police, and thus was not entitled to *Miranda* warnings; (2) the emotional outburst of the victim's mother as she took the witness stand did not require a mistrial; (3) the trial court properly found aggravating circumstances; (4) the trial court properly rejected the defendant's claim of mitigating circumstances; and (5) the death sentence

---

[2]  (1) the homicide was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification; (2) the homicide was especially heinous, atrocious, or cruel; and (3) the homicide was committed while the defendant was engaged in a kidnapping. *Id.* (footnotes omitted).

[3]  (1) no significant history of prior criminal activity and (2) the nonstatutory mitigating circumstance of remorse.   *Id.*

was not disproportionate.  *See id.* at 178.

 Thereafter, Arbelaez sought post-conviction relief.  The trial court summarily denied all relief requested.  *See Arbelaez v. State*, 775 So. 2d 909 (Fla. 2000).  On appeal from the denial of the post-conviction motion, Arbelaez raised thirteen claims.[4]  The Florida Supreme Court denied relief but remanded "because the record does not conclusively demonstrate that Arbelaez is entitled to no relief on his claim of ineffective assistance of counsel during the penalty phase, the trial court could not properly deny his post-conviction motion without an evidentiary hearing." *Id.* at 920.  The court remanded "this matter to the trial court with instruction to conduct an evidentiary hearing on this claim." *Id.*

 On remand, the trial court held an evidentiary hearing and again denied the motion for post-conviction relief.  Just before the court entered its order, Arbelaez filed a supplemental motion under Florida Rule of Criminal Procedure 3.850 arguing the applicability of the then-recent United States Supreme Court decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Atkins v. Virginia*, 536 U.S. 304 (2002).[5]  The trial court denied the supplemental claims as

---

[4] (1) the trial court erred in summarily denying Arbelaez's post-conviction motion under Florida Rule of Criminal Procedure 3.850; (2) the court erred in denying Arbelaez's motion to disqualify Judge Leslie Rothenberg; (3) the trial court erred in ordering that the files of Arbelaez's trial counsel be disclosed to the State; (4) the police department failed to provide all of the public records requested and the trial court erred in refusing to disclose various records of the state attorney's and attorney general's offices after an in-camera inspection; (5) the police officers exerted psychological coercion to lure Arbelaez back to the United States from Colombia so that a confession could be obtained; (6) trial counsel was ineffective in permitting a juror to serve as an alternate juror when he had already stricken this juror peremptorily; (7) the record on appeal was unreliable and counsel was ineffective for failing to raise the issue on appeal; (8) the prejudicial effect of gruesome photographs introduced into evidence outweighed their probative value; (9) trial counsel was ineffective for failing to object to various constitutional errors; (10) the one-year time limit imposed by Florida Rule of Criminal Procedure 3.851 for filing a motion for post-conviction relief in a capital case is unconstitutional; (11) the death penalty is unconstitutional; (12) the death penalty is not appropriate under the circumstances of this case; and (13) trial counsel was prohibited from interviewing jurors to discover information that could warrant a new trial.

[5] *Atkins* prohibited the execution of mentally retarded offenders. Arbelaez asserted that "after *Atkins*, the absence of mental retardation is now an element of capital murder that, under *Ring*, the jury must consider and find beyond a reasonable doubt." *Arbelaez,* 898 So. 2d at 43.

untimely and procedurally barred. Arbelaez appealed the trial court's order denying post-conviction relief, as well as the denial of his supplemental *Ring* and *Atkins* claims. Arbelaez also petitioned for a writ of habeas corpus raising five separate claims of ineffective assistance of appellate counsel. *See Arbelaez v. State*, 898 So. 2d 25 (Fla. 2005). The Florida Supreme Court denied all relief. *Id.* During the pendency of his appeal, Arbelaez filed a second motion for post-conviction relief in the trial court asserting that his execution is forbidden by state and federal law because he was mentally retarded. The trial court denied relief but the Florida Supreme Court remanded for an evidentiary hearing on that claim. *Arbelaez v. State*, 950 So. 2d 413 (Fla. 2006)(table decision).

The trial court held evidentiary hearings over a two-month period. Ultimately, the trial court again denied relief. On appeal, the Florida Supreme Court affirmed indicating: "We hereby affirm the post-conviction court's denial of relief. Arbelaez did not prove that he has concurrent deficits in adaptive behavior as required by section 921.137(1), Florida Statutes (2004), and Florida Rule of Criminal Procedure 3.203(b)." *Arbelaez v. State*, 72 So. 3d 745 (Fla. 2011). On September 11, 2012, Arbelaez filed this federal petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming ineffective assistance of counsel and that his mental disability precludes his execution. The State has asserted that the petition is untimely.

### III. TIMELINESS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposed a 1-year limitation period for the filing of an application for relief under 28 U.S.C. § 2254. Accordingly, 28 U.S.C. § 2244(d) provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of State court. The limitation period shall run from the latest of -

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In most cases, including the present case, the limitation period begins to run pursuant to § 2244(d)(1)(A).  The Eleventh Circuit has decided that the judgment becomes "final" within the meaning of § 2244(d)(1)(A) as follows: (1) "if the prisoner files a timely petition for certiorari, the judgment becomes 'final' on the date on which the Supreme Court issues a decision on the merits or denies certiorari, or (2) the judgment becomes 'final' on the date on which the defendant's time for filing such a petition expires." *Kaufman v. United States*, 282 F.3d 1336, 1339 (11th Cir. 2002).

In 1996, Congress set a 1-year limitation period for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1).  Congress intended the AEDPA to further the principles of comity, finality, and federalism. *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that "there is no doubt Congress intended AEDPA to advance these doctrines [comity, finality, and federalism]").  Clearly,

6

Congress created a limitation period of 1 year that was meant to streamline the habeas review process and to lend finality to state court convictions. *Duncan v. Walker*, 533 U.S. 167 (2001) (recognizing that "[t]he 1 year limitation period of § 2244(d)(1) quite plainly serves the well-recognized interest in the finality of state court judgments"); *see also* H.R. Cong. Rep. No. 104-518, at 111 (1996), *reprinted in* H.R. Conf. Rep. No. 518, 104th Cong., at 111 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 944 (1996) (explaining that, in enacting AEDPA, Congress wanted "to curb the abuse of the statutory writ of habeas corpus" by adding, among other things, a one-year period of limitation to the time a state prisoner has to seek habeas relief from a state conviction). The AEDPA seeks to eliminate delays in the federal habeas review process. *See Day v. McDonough*, 547 U.S. 198, 205-206 (2006).

The United States Supreme Court denied Arbelaez's petition for writ of certiorari on May 23, 1994. *See Arbelaez v. Florida*, 511 U.S. 1115 (1994). At that time, a 1-year limitation period did not exist for federal habeas petitions. *See Wilcox v. Fla. Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998). However, on April 24, 1996, Congress enacted the AEDPA which imposed the limitation period of 1 year on federal habeas petitioners. As Arbelaez's conviction and sentence was final before the enactment of the AEDPA, he had 1 year from the enactment to file his federal habeas petition pursuant to § 2254. *See Wilcox*, 158 F.3d at 1211. In other words, Arbelaez's habeas petition was due on April 23, 1997. The record is clear that Arbelaez did not file his petition here until September 11, 2012. Therefore, unless he had "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim [] pending", the statute of limitations would have expired and the instant habeas petition would be untimely. *See* 28 U.S.C. § 2244(d)(2).

Because Arbelaez filed his initial post-conviction motion before the enactment of the

AEDPA in 1996, the statute of limitations would have started to run in 1997. As such, the limitations period was tolled until his initial motion was denied, affirmed on appeal, and the Florida Supreme Court issued its mandate. The AEDPA clock resumes running when the state's highest court issues its mandate disposing of the motion for post-conviction relief. *Lawrence v. Florida*, 549 U.S. 327, 331–32 (2007). Here, the mandate issued on April 4, 2005. *See Arbelaez v. State*, 898 So. 2d 25 (Fla. 2005). Therefore, Arbelaez's federal habeas petition must have been filed within one year, which is by April 4, 2006 to be considered timely. It was not.

The only way Arbelaez's instant federal habeas petition could be considered timely would be if he had another properly filed state post-conviction motion pending *before* April 4, 2006. "A state application filed after expiration of the limitations period does not relate back so as to toll idle periods preceding the filing of the federal petition." *See Moore v. Crosby*, 321 F.3d 1377, 1381 (11th Cir. 2003) (the statutory tolling provision does not encompass a period of time in which a state prisoner does not have a "properly filed" post-conviction application actually pending in a state court). "[T]he tolling provision does not operate to revive the one-year limitations period if such period has expired." *Id.*; *see also Tinker v. Moore*, 255 F.3d 1331, 1333 (11th Cir. 2001) (explaining that where a Rule 3.850 motion is filed after the expiration of the one-year period, it does not toll the period under § 2244(d)(2) because no period remains to be tolled). Here, the State asserts that Arbelaez did not have a "properly filed" motion pending because his second post-conviction motion, as filed, failed to attach the oath required by the Florida Rules of Criminal Procedure.[6] Arbelaez asserts that he did, in fact, attach an oath to his motion.

---

[6] The State also asserts that Arbelaez's third motion for post-conviction relief, filed November 23, 2010 was not properly filed because "[t]he state post-conviction court denied the third motion for post-conviction relief as untimely because it was filed more than a year after Petitioner's conviction became final and was not based on newly discovered evidence or a new retroactive constitutional right." ([DE 13] at 36).

### *State Post-Conviction History*

Arbelaez's state post-conviction proceedings began in August of 1995 when he filed his initial post-conviction motion.  *See Arbelaez v. State*, 775 So. 2d 909 (Fla. 2000).   After receiving responses to his public records requests, Arbelaez filed an amended motion in July of 1996.   The trial court summarily denied all relief and Arbelaez appealed to the Florida Supreme Court.  *Id.* at 912.   The Florida Supreme Court affirmed in part, reversed in part, and remanded for an evidentiary hearing on Arbelaez's claim of ineffective assistance of counsel during the penalty phase.  *Id.* at 920.

Meanwhile, after the evidentiary hearing ordered by the Florida Supreme Court was held, but before the state trial court's order denying the ineffective assistance of counsel claim, Arbelaez filed a "supplemental motion under Florida Rule 3.850 arguing the applicability of the then recent United States Supreme Court decisions in *Ring v. Arizona*, 536 U.S. 584 (2002), and *Atkins v. Virginia*, 536 U.S. 304 (2002)."   This supplemental motion was filed on October 10, 2002. (*See* [DE 15-47] at 13-46).   The state trial court ultimately denied relief on the ineffective assistance of counsel at the penalty phase claim.  *Arbelaez v. State*, 898 So. 2d 25 (Fla. 2005).   The supplemental motion was also denied by the trial court before the Florida Supreme Court reached the merits of Arbelaez's appeal of the denial of his post-conviction claim.   The Florida Supreme Court consolidated the appeal of the denial of the claim after hearing and the denial of the supplemental motion.  *See Arbelaez v. State*, 898 So. 2d 25 (Fla. 2005).   The mandate issued on April 4, 2005. ([DE 15-283] at 21).

However, before that mandate issued, Arbelaez filed his second motion to vacate judgment and sentence pursuant to Florida Rule of Criminal Procedure 3.850.   The second motion was filed on November 30, 2004. ([DE 15-67] at 11-30).   This is the operative motion.   If this second

9

motion was not properly filed, Arbelaez's federal habeas petition is untimely.

In the second motion, Arbelaez asserted that he could not be executed because he was mentally retarded.   The State responded and filed a motion to strike asserting that: (1) Arbelaez did not seek relinquishment from the Florida Supreme Court of his pending appeal, (2) that counsel for Arbelaez failed to attach a certificate of good faith that the motion was made in good faith and on reasonable grounds to believe that his client is intellectually disabled, (3) the motion failed to attach expert opinions and (4) the motion attacks the constitutionality of Florida Rule 3.203 and cannot be a claim under the rule it challenges. ([DE 15-67] at 31).   The state trial court held oral argument and then summarily denied the motion, finding it without merit, refuted by the record, and procedurally barred as previously raised.   ([DE 15-67] at 70).   On appeal, the Florida Supreme Court remanded the case back to the state trial court for an evidentiary hearing on the claim.   *See Arbelaez v. State*, 950 So. 2d 413 (Fla. 2006) (unpublished opinion).

The Florida trial court held evidentiary hearings on June 23-26, July 15-17, and July 20-21, 2009.   On May 7, 2010 the Florida trial court denied the claim.   Arbelaez appealed to the Florida Supreme Court, which affirmed the ruling on September 19, 2011.   *See Arbelaez v. State*, 72 So. 3d 745 (Fla. 2011).   The mandate issued on May 25, 2012.   Arbelaez's federal habeas petition was filed on September 11, 2012.   [DE 1].   If Arbelaez's second post-conviction motion was properly filed, the instant federal habeas petition would be timely.

The State asserted in its Response to Arbelaez's petition for writ of habeas corpus that the petition "is barred by the statute of limitations." ([DE 13] at 35).   The State made two principal arguments.   The first argument is easily resolved.   The State argued that Arbelaez's third motion for post-conviction relief filed on November 23, 2010 did not toll the time because it should not be considered properly filed.   ([DE 13] at 36).   The State asserted that it was not properly filed for

federal habeas purposes because the state court ruled that the motion itself was untimely. (*Id.* at

37).   However, Arbelaez's federal habeas petition was either due on April 4, 2006 (if no properly

filed post-conviction motion was filed) or, if his second post-conviction motion was properly filed,

then his federal petition was due one year from when the mandate issued on May 18, 2012.   Either

way, Arbelaez's third post-conviction motion filed on November 23, 2010 does not affect the

timeliness of Arbelaez's federal habeas petition.

### *Waiver of Argument on Failure to Attach the Oath*

The State's second argument is that Arbelaez's second post-conviction motion was not

properly filed because the "record shows that Petitioner never sworn [sic] to this motion." ([DE 13]

at 37).

In Florida, motions to vacate, set aside, or correct a sentence must be made under oath.

*See* Rule 3.850(c) and 3.851(e)(1).   The purpose of the 3.850 oath requirement was to prevent

false allegations of fact without the fear of a perjury conviction.   *See Gorham v. State*, 494 So. 2d

211, 212 (Fla. 1986).   Failure to meet the oath requirement of the rule governing motions to

vacate, set aside, or correct sentence warrants dismissal of such motion without prejudice.

Florida Rule of Criminal Procedure 3.987 requires that motions for post-conviction relief must be

"legibly handwritten or typewritten, signed by the defendant, and contain either the first or second

oath set out at the end of this rule."

The record reflects that Arbelaez's second post-conviction motion does not currently have

such an oath attached. ([DE 15-67] at 11-30).   The record also reflects that *for 8 years* and after

multiple hearings, hundreds of pages of pleadings, a fully-briefed appeal to the Florida Supreme

Court, a remand ordering an evidentiary hearing on the motion, the actual evidentiary hearing

being held over a period of several weeks in the state trial court, and another fully-briefed appeal to

the Florida Supreme Court, the State asserts, for *the first time*, that Arbelaez's second post-conviction motion was unsworn.

The State essentially asserts that the failure on its part to raise this issue before now should be of little concern to this Court despite the fact that the Florida Supreme Court considered the motion on the merits.   In support of this argument, the State cited two cases. *Gorby v. McNeil*, 530 F.3d 1363, 1367-68 (11th Cir. 2008) and *Walton v. Sec'y, Fla. Dep't of Corr.* 661 F.3d 1308, 1310-12 (11th Cir. 2011).   In *Gorby*, no party disputed that the post-conviction motion was untimely under the state procedural rules and the state trial court found it untimely when the motion was denied.   In *Walton*, the State Supreme Court denied Walton's second habeas petition as successive.   In both cases, the state court was clear that there was a procedural infirmity with the post-conviction motion.   As such, the Eleventh Circuit concluded that it "will not allow the tolling of AEDPA's limitations period *when it is clear* that the petitioner failed to seek timely review in state court." *Gorby*, 530 F.3d at 1368. (emphasis added).   These two cases are factually distinguishable.

In this case, the State is implying the Court's task is straightforward.   The Court should look at the motion, see that there is no oath from Arbelaez attached and find that it was not properly filed.   Arbelaez's federal habeas petition would be dismissed and the merits of his case never considered.   For *8 years*, counsel for the State failed to advise any court that the second post-conviction motion was supposedly unsworn, but now advances that argument as the basis for this Court to deny Arbelaez the opportunity to have his federal habeas petition heard on the merits. Given the specific facts of this case, the Court rejects the State's view that a federal court should find that a state post-conviction motion was not properly filed for failure to attach an oath even though the state court reached the merits of the motion.

### *State Court Record*

Arbelaez's state court record spans 24 years. The Florida Supreme Court remanded the case several times for evidentiary hearings after the state trial court summarily denied his Rule 3.850 motions. As one might expect, with 20 plus years of post-conviction litigation, the record is voluminous. This Court has reviewed the entire file and confirms that fact. Human nature almost assures that documents will be misplaced or misfiled when dealing with such a large court file. This is why the State's last minute contention that the second post-conviction motion was unsworn is itself untimely. In addition, the proposition is devoid of sufficient reliability, in view of the voluminous page pleadings that are part of the record that cannot exclude the possibility, if not the probability, that the document with the oath is simply lost. This is particularly probable when considering the sworn statement by Petitioner's counsel that the petition was accompanied by the required oath.

In reply to the State's timeliness arguments, Arbelaez provided the Court with 12 motions or notices filed over the course of 19 years where the Miami-Dade County Clerk's Office had lost, misplaced, or otherwise failed to provide the Florida Supreme Court with the proper record on appeal. ([DE 24] 3-14). The items missing from the record included portions of the actual trial transcripts from the guilt and sentencing phases, ([DE 24-3]); Volume 1 of Arbelaez's entire court file ([DE 24-4]); the order denying relief by the lower court following an evidentiary hearing; a motion to disqualify the lower court judge; a motion to exclude the potential testimony of witness Lisa Wiley ([DE 24-5]); "missing pages 2 thru 5" of the Motion to Disqualify Judge and Supporting Memorandum of Law ([DE 24-6]); the State's Response in Opposition to the Motion to

Disqualify and the Order on the Motion to Recuse[7] ([DE 24-7]); certain documents were filed but returned by the Florida Supreme Court for incorrect pagination, ([DE 24-10]); the State's Motion to Strike Motion to Vacate Judgment and Sentence Pursuant to Rule 3.850/3.851 and the appendix[8] ([DE 24-11]); a notice of appearance; an order scheduling status conference for July 12, 2007; an order scheduling status conference for July 6, 2007; an order scheduling status conference for September 24, 2007; an attachment to notice of filing;[9] the State's motion for test protocols/raw data, notice of court appearance; the State's notice of hearing on November 26, 2007; the State's motion to establish procedure during the psychological examination of defendant; the response to motion to establish procedure during psychological examination; the motion to obtain test to be administered by state psychologist; the motion to videotape evaluation; the petitioner's emergency petition to stay proceedings; the notice of filing defendant's supplemental witness list; the notice of filing order scheduling case management conference; the Defendant's Exhibit C;[10] the order scheduling status conference; the transcript of telephonic deposition; the motion for reconsideration of evidentiary ruling; the memorandum of law regarding background materials supplied to expert; the notice of intent to appear telephonically; the defendant's written closing argument; the notice of appeal; the order scheduling status conference; the notice of hearing; the order scheduling status conference. ([DE 24-13]).   The

---

[7]   There were also subsequent requests for these same documents when the state circuit court clerk could still not locate copies of these documents. ([DE 24-8 & 24-9]).

[8]   The State of Florida had to file a notice that the circuit court clerk had still been unable to find certain documents but was "continuing to look for them." ([DE 24-12]).

[9]   This document was provided but was not photocopied properly; pages were missing and the back sides of the two-sided documents were not copied.

[10]   This document was provided but was not photocopied properly; pages were missing and the back side of the two-sided documents were not copied.

State knew of the incompleteness of the court record because the State either filed the actual motions to supplement the record or was consulted by opposing counsel and did not object to his request to have the record supplemented.

With the passing of more than a quarter of a century, it is understandable that the record is replete with missing or incomplete documents, inaccurate photocopying, and incorrect pagination. Yet the State would like the Court to simply dismiss the petition of an inmate sentenced to death without giving consideration to the merits of his claims or even to the substantial probability that the attached page with the oath to the Petitioner's second state post-conviction motion is simply lost. Under the unique facts of this case – particularly the passage of 8 years before the State raises any objection to the supposedly missing page with the oath – the Court will not elevate form over substance under the time-barred statutory and case law applicable to a federal post-conviction petition. More importantly, because of the numerous missing documents throughout the 8-year period of post-conviction litigation, the State simply has not proven that the second post-conviction motion was not sworn. Arbelaez filed an affidavit from his post-conviction counsel, Todd Scher, Esq. that swore under oath that he filed Arbelaez's oath when the Rule 3.850 motion was filed. ([DE 24-1]). "What I can say with absolute certainty is that the verification was filed and that the State never took a position to the contrary in all the years that the motion was being litigated in the state court." (*Id.* at 3).

Without more, the Court must review the merits of Arbelaez's claims finding the State has not rebutted the Petitioner's claim that he filed an oath. In any event, the State has waived its timeliness objection by being untimely itself.

### IV. STANDARD OF REVIEW

Having disposed of the timeliness objection, the Court proceeds to analyze the merits of the

15

petition. Arbelaez's habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214 (1996) (codified as amended at U.S.C. §§ 2241-55), which significantly changed the standards of review that federal courts apply in habeas corpus proceedings.   The AEDPA allows federal courts to grant habeas corpus relief only if the state court's resolution of those claims (1)"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2)"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

"A state court decision's is 'contrary to' clearly established Supreme Court precedent in either of two respects: (1) 'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,' or (2) 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *DeBruce v. Comm'r, Ala. Dep't of Corr.*, No.11-11535, 2014 WL 3427198, *1 (11th Cir. July 15, 2014) (quoting *Williams*, 529 U.S. at 405-06).   The Eleventh Circuit also drew the distinction from when a state court decision is an *unreasonable* application of clearly established federal law versus an *incorrect* application of federal law. *Id.*   In so holding, *DeBruce* instructed federal courts to grant state courts "deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* (quoting *Harrington v. Richter*, 131 S. Ct. at 770, 785 (2011)).   As a result, a federal court must deny habeas relief "so long as fairminded jurists could disagree on the correctness of the state court decision." *Id.* (quoting *Harrington*, 131 S. Ct. at 786).

With respect to the "unreasonable application" prong of § 2254(d)(1), which applies when

16

a state court identifies the correct legal principle but purportedly applies it incorrectly to the facts before it, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).   An "unreasonable application" can also occur if a state court "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

As noted above, § 2254(d)(2) provides an alternative avenue for relief.   Habeas relief may be granted if the state court's determination of the facts was unreasonable.   "A state court's determination of the facts, however, is entitled to deference" under § 2254(e)(1).   *See DeBruce*, 2014 WL 3427198 at *2.   This means that a federal habeas court must presume that findings of fact by a state court are correct; and, a habeas petitioner must rebut that presumption by clear and convincing evidence.   *See Hunter v. Sec'y, Dept. of Corr.,* 395 F.3d 1196, 1200 (11th Cir. 2005).

Finally, where a federal court would "deny relief under a de novo review standard, relief must be denied under the much narrower AEDPA review standards." *Jefferson v. Fountain*, 382 F.3d 1286, 1295 n.5 (11th Cir. 2004).

## V. ANALYSIS

Arbelaez asserts four claims for federal habeas relief.   First, Arbelaez contends that it would violate the Eighth Amendment's prohibition against excessive punishment to execute him because he is intellectually disabled as defined by *Atkins v. Virginia*, 536 U.S. 304 (2002). Arbelaez's second ground for relief is a hybrid of the first.   Arbelaez's first argument is a legal one as he asserts that the Florida Supreme Court unreasonably applied clearly established federal law when it determined that Arbelaez was not intellectually disabled. His second claim is that the

17

Florida Supreme Court made an unreasonable determination of the facts when it determined that Arbelaez was not mentally retarded.[11]   Arbelaez's third claim is that he was denied the effective assistance of counsel during the penalty phase of his trial.   Finally, Arbelaez argues that he was denied the effective assistance of counsel during the guilt phase of his trial.   For the reasons that follow, Arbelaez's four claims for habeas relief are dismissed

### A.    The Florida Supreme Court's application of *Atkins v. Virginia.*

In order for the Court to grant Arbelaez federal habeas relief, he must show that, when the Florida Supreme Court determined that he "did not prove that he has concurrent deficits in adaptive behavior," that this was an unreasonable application of clearly established federal law. *Arbelaez v. State*, 72 So. 3d 745 (Fla. 2011)(unpublished opinion).   This is a very high standard to meet.   Under these circumstances, Arbelaez can satisfy the "unreasonable application" prong of § 2254(d)(1) only by showing that "there was no reasonable basis" for the Florida Supreme Court's decision.   *Harrington*, 131 S. Ct. at 784 (2011) ("[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.").   It is undisputed that *Atkins v. Virginia*, 536 U.S. 304, is the clearly established federal law governing Arbelaez's claim that the death penalty would violate the Eighth Amendment's prohibition because he is intellectually disabled.

### *Atkins v. Virginia* and *Hall v. Florida*

Arbelaez asserts that the Florida Supreme Court's determination that he is not mentally

---

[11]The pleadings and Florida law refer to the term as mentally retarded.   More recent cases use the terminology intellectually disabled to note the same condition.

retarded was an unreasonable application of, and in conflict with, the clearly established federal law as recited by the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304 (2002). The basis for his argument is that the Florida Supreme Court unreasonably applied *Atkins* "by placing an impossible burden on Arbelaez to show adaptive deficits in an environment where adaptive behavior cannot be observed," ([DE 1] at 35), such as the structural institutional setting of a prison.

In *Atkins*, the United States Supreme Court held that the execution of mentally retarded offenders is categorically prohibited by the Eighth Amendment to the U.S. Constitution. 536 U.S. at 321. *Atkins* did not define mental retardation, *leaving it to the states to develop appropriate ways to prohibit* the execution of the mentally retarded. However, the Court did provide some guidance to the states regarding the definition of mental retardation by citing two clinical definitions of mental retardation that it noted were consistent with many state statutory definitions. *Atkins*, 536 U.S. at 308 n. 3. It was not until after *Atkins* that the Florida Supreme Court adopted Florida Rule of Criminal Procedure 3.203 establishing the procedure for all capital defendants raising claims of mental retardation or intellectual disability as a bar to execution. *See* FLA. R. CRIM. P. 3.203; Amendments to FLA. R. CRIM. P. & FLA. R. APP. P., 875 So. 2d 563 (Fla. 2004). Prior to the *Atkins* decision and the enactment of Rule 3.203, the State of Florida had only a statutory prohibition against the execution of mentally retarded person.[12] Rule 3.203's definition of mental retardation is substantially identical to that of Florida Statute § 921.137 and the clinical definitions in *Atkin*s. According to Florida law, Rule 3.203 is applicable to Arbelaez's claim.

Florida Rule of Criminal Procedure 3.203(b) provides:

---

[12] Section 921.137, Florida Statutes. "[H]owever, [921.137] applies only to persons sentenced to death after the effective date of the statute in 2001." *Carroll v. Sec'y, Dept. of Corr.*, 574 F.3d 1354, 1367 (11th Cir. 2009). Arbelaez was sentenced in 1991. Therefore, his claim should be evaluated solely in the context of the *Atkins* mental retardation interpretation and Florida Rule 3.203. *See id.* at 1367.

> **Definition of Mental Retardation**. As used in this rule, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this rule, means performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services in rule 65G–4.011 of the Florida Administrative Code. The term "adaptive behavior," for the purpose of this rule, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.

On May 27, 2014 the United States Supreme Court in *Hall v. Florida*, 134 S. Ct. 1986 (2014) found Florida's law defining intellectual disability to require an Intelligence Quotient ("IQ") test score of 70 or less was too rigid to pass constitutional scrutiny.[13]   A state cannot execute a person whose IQ test score falls within the test margin of error, unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.   The Supreme Court instructed courts to examine a variety of adaptive deficits to determine if an individual is intellectually disabled and therefore, exempt from the death penalty. Thus, the Florida Supreme Court's use of a bright-line rule of an IQ of 70 as discussed in *Cherry v. State*, 959 So. 2d 702 (Fla. 2007) was reversed.   Under *Cherry*, in Florida, a person whose IQ test score was above 70, including a score within the margin of measurement error, was automatically found not to have an intellectual disability and was barred from presenting other evidence that would show his faculties are limited.   Arbelaez's IQ score, according to his own expert, is below 70.   Therefore, the strict IQ test score cutoff of 70 invalidated by the United States Supreme Court is not an issue in this case.

In fact, as *Hall* points out "[i]n determining who qualifies as intellectually disabled, it is

---

[13] The rule in *Hall* has not been made retroactive by the United States Supreme Court.   *See In Re: John Ruthell Henry*, No. 14-12623, 2014 WL 2748288 (11th Cir. June 17, 2014).

proper to consult the medical community's opinions."

> As the Court noted in *Atkins*, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period.   This last factor, referred to as "age of onset," is not at issue. The first and second criteria – deficits in intellectual functioning and deficits in adaptive functioning – are central here.   In the context of a formal assessment, "[t]he existence of concurrent deficits in intellectual and adaptive functioning has long been the defining characteristics of intellectual disability."

*Hall*, 134 S. Ct. at 1994 (2014) (internal citations omitted) (quoting *Brief for American Psychological Assoc., et al. as Amici Curiae*, 12-13).   The Court in *Atkins* did not provide a specific definition of mental retardation, but it did provide two clinical definitions for the diagnosis as guidance to the states:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

> Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

*Atkins*, 536 U.S. at 309, n.3.   It is apparent, from the text of Florida's Rule 3.203 and the clinical definitions in *Atkins*, that Florida's definition of mental retardation is substantially similar to those cited by the United States Supreme Court in both *Atkins* and *Hall*.

The parties do not dispute that Florida's definition of intellectual disability or mental retardation and that of the American Association of Mental Retardation ("AAMR" and now the "AAIDD") and the American Psychiatric Association ("APA") are consistent.   Arbelaez concedes that "[t]he Florida definition of mental retardation as it pertains to a criminal defendant's eligibility for the death penalty is consistent with and virtually identical to those promulgated by the APA and AAMR." ([DE 1] at 36).   Where the dispute between Arbelaez and the State arises is in Florida's application of that definition.   Specifically, Arbelaez's argument is that "[t]he issue at had [sic] is whether *Atkins* permits a state to craft a definition of Mental Retardation that requires the application of diagnostic criteria so restrictive as to preclude a diagnosis of Mental Retardation ever being made on incarcerated individuals, which is what the Florida scheme effectively does." ([DE 24] at 19).

Therefore, the question before the Court is a narrow one.   Arbelaez's first claim is not necessarily about the application of *Atkins* to his specific facts but, instead it is that Florida's method for determining mental retardation is unconstitutional. (*See* [DE 24] at 21).   Despite the limited nature of this claim, the Court has reviewed the entire record from the state courts and will discuss the evidence in detail before addressing the merits.

### *Evidentiary Hearing*

Arbelaez was granted an evidentiary hearing on this claim in state court.   Over a period of

several days, the defense and the State presented expert and lay witnesses to testify as to Arbelaez's level of intelligence,[14] adaptive behaviors, and manifestation before age 18. A summary of the testimony follows:

(1) Dr. Ricardo Weinstein, a licensed psychologist from California, testified about the necessity to conduct a retrospective analysis when the individual being evaluated is older than 18 years of age to establish that the disability was present prior to age 18. ([DE 15, Appx. GG, Vol. 78] at 153). In the course of his evaluation, Dr. Weinstein interviewed Arbelaez, conducted testing, reviewed documents, interviewed collateral sources and conducted adaptive behavioral assessments with Arbelaez's family, friends and employers in both the United States and in Colombia. Dr. Weinstein administered intelligence testing and concluded that Arbelaez's IQ is below 70. Dr. Weinstein conducted tests with Arbelaez but did not interview or speak to anyone within the correctional system. Dr. Weinstein did not interview prison officials because "they wouldn't have any knowledge regarding how Arbelaez functions in the real world." (*Id.* at 192). Dr. Weinstein testified that the specific crime for which Arbelaez was convicted is "not relevant for the determination of mental retardation." Dr. Weinstein also testified that "the facts of the crimes are not relevant to the determination of mental retardation." (*Id.* at 276). Further, Dr. Weinstein testified that what Arbelaez remembers "about the crime and his confession is also not relevant for the determination of mental retardation." (*Id.*). Ultimately, Dr. Weinstein concluded that Arbelaez should be diagnosed as having mental retardation based on his subaverage

---

[14] The Florida Supreme Court denied Arbelaez's claim solely on his failure to prove that "he has concurrent deficits in adaptive behavior." *See Arbelaez*, 72 So. 3d 745 (Fla. 2011)(unpublished opinion). This is the second prong of Florida's three prong definition of mental retardation. Therefore, the Court does not engage in a lengthy discussion regarding Arbelaez's subaverage intelligence. The Court assumes that Arbelaez's intelligence level appears to have met the standard under Florida law, although the State presented evidence that Arbelaez was malingering to the extent that his subaverage intelligence quotient would have been skewed. ([DE 1] at 72).

intelligence and the adaptive deficits present before age 18.

(2)   The defense called Dr. Marc Tasse, a licensed psychologist. ([DE 15, Vol. 37, Appx. GG] at 379).   Dr. Tasse's areas of expertise are mental retardation and autism.   Dr. Tasse co-authored the User's Guide on how to help clinicians make a diagnosis of intellectual disabilities.   Dr. Tasse testified that the State of Florida's definition of mental retardation is consistent with the American Association of Intellectual and Developmental Disabilities and the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition.   (*Id.* at 388).   However, Dr. Tasse also testified that a retrospective diagnosis is appropriate for individuals who have been incarcerated for some time. Dr. Tasse offered little by way of facts about Arbelaez because he did not meet or evaluate Arbelaez.   Rather, he testified generally about how mental retardation *should* be diagnosed in a clinical context.

(3)   The defense also called Dr. Thomas Oakland.   Dr. Oakland has a PhD in educational psychology. ([DE 15, Vol. 38, Appx. GG] at 454).   Dr. Oakland specializes in "adaptive behavior, the assessment of intelligence, mental retardation, . . . ethics and law, or at least ethics and temperament." (*Id.* at 459).   Similar to Dr. Tasse, Dr. Oakland did not meet or interview Arbelaez. Dr. Oakland testified that "[i]t is not possible to assess adaptive behavior within the setting similar to death row." (*Id.* at 556).   Dr. Oakland interpreted "concurrent" when assessing adaptive behavior to mean before age 18 rather than "now." (*Id.* at 568).   Dr. Oakland testified that "nothing that happens in the prison setting, in which the defendant lives now, can inform [him] as to whether or not [Arbelaez] is mentally retarded." (*Id.* at 582).   Dr. Oakland also testified that the fact that Arbelaez fled after the crime, used an alias, and traveled to Puerto Rico would not tell him anything about Arbelaez's adaptive behavior because "I don't know the context or the degree to

24

which that was independent." (*Id.* at 587).   Dr. Oakland also testified that all criminal behavior is mal adaptive and is not considered in making a diagnosis of adaptive deficits.

(4)   The defense then called a series of lay witnesses who testified regarding Arbelaez's life when he resided in Medellin, Colombia as a child or as an adult in Miami, Florida: Amparo Arbelaez Alvarez (Arbelaez's sister), Flor Celina Arboleda Palacio (Arbelaez's sixth grade Spanish teacher), Vincente Manuel Soler (Arbelaez's former employer), Jorge Salazar (a friend with whom Arbelaez briefly resided with in Miami), and Martha Arguelles (a friend of Arbelaez who provided him with the money to leave the country after the crime).

(5)   The defense also called three corrections officers, who have observed Arbelaez while on death row: Sergeant Henry Walker, Sergeant Jerome Lee (supervisor of the prison law library) and Officer John Flattery.   These officers testified regarding the policy and procedures of the prison and, specifically, the operations of death row.   [DE 15, Vol. 39, Appx. GG].   These officers were asked to complete an adaptive behavior questionnaire from Dr. Suarez, the State's expert witness.   The defense inquired about the specific process of completing the questionnaire.

(6)   The State called Dr. Enrique Suarez, a licensed psychologist. ([DE 15, Vol. 40, Appx. GG] at 860).   Dr. Suarez testified that, in Florida, mental retardation is diagnosed by looking at intellectual functioning and, at the same time, adaptive behavior.   If those two prongs are met, then you would consider if those adaptive deficits and subaverage intellect also existed before the age of 18. (*Id.* at 880-82).   Dr. Suarez testified that he reviewed records both before and after Arbelaez's arrest and incarceration.   Dr. Suarez also met with and conducted tests on Arbelaez while he was on death row.   Dr. Suarez conducted the testing in Spanish. (*Id.* at 905).   In reaching his conclusion that Arbelaez was not mentally retarded, Dr. Suarez considered that Arbelaez came to this country from Colombia with relatively little assistance, secured

employment, which he performed at an acceptable level, utilized alias at work (before he was legally eligible to work in the United States) and he fled to Puerto Rico after the crime.   Arbelaez was also able to drive, run errands, and take his clothing to the laundromat.   Dr. Suarez found that Arbelaez's ability to communicate with others and understand his environment even in an English speaking country is relevant to making a determination of mental retardation. (*Id.* at 968).   Dr. Suarez reviewed artwork that Arbelaez has done while incarcerated.   This artwork is posted on a website by the Canadian Coalition Against the Death Penalty.   Arbelaez sends his artwork to a pen pal in England who has them uploaded to the website.   Dr. Suarez concluded by testifying definitively that Arbelaez is not mentally retarded.

(7)   The State next called Dr. Sonia Ruiz, ([DE 15, Vol.41, Appx. GG] at 1097), a clinical psychologist, appointed by the court to conduct a psychological evaluation of Arbelaez in November 2001.   In the course of her evaluation, Dr. Ruiz reviewed prior evaluations conducted by Dr. Latterner and Dr. Castellanos.   Dr. Ruiz interviewed Arbelaez for an hour and a half. Arbelaez told Dr. Ruiz that he had traveled alone to Venezuela, the Bahamas, Panama, and Jamaica prior to his arrival in the United States in 1980.   Dr. Ruiz also considered Arbelaez's work history prior to his incarceration where he held a variety of jobs including when he was in charge of "opening up, receiving and distributing merchandise to the cook." (*Id.* at 1110).   Dr. Ruiz concluded that it was not her "opinion that the defendant was mentally retarded." (*Id.* at 1120).   Dr. Ruiz relied primarily on Arbelaez's self-reporting and did not independently corroborate the information that he provided to her.

(8)   The State's final witness was Lisa Wiley.   Ms. Wiley worked at the Florida Department of Corrections as a Mental Health Specialist.   She is a psychologist with a master's degree but she is not a licensed clinical psychologist. ([DE 15, Vol. 41, Appx. GG] at 1139).   She

has been trained to evaluate people for mental retardation.   Ms. Wiley has known Arbelaez since
1992.  Ms. Wiley testified that Arbelaez was neat, well-kept and his cell was clean.   Ms. Wiley
did not observe an inability to care for himself, which could have been indicative of mental
retardation. (*Id.* at 1175).  However, Ms. Wiley has only observed Arbelaez in the structured
institutional setting of prison.

After the hearing concluded, the state circuit judge issued a detailed order summarizing the
witnesses' testimony and the appropriate legal standard. ([DE 15, Appx. GG, Vol 35] at
6388-6405).  Specifically, the post-conviction judge found:

> Defendant's reliance solely on a retrospective evaluation is not in compliance with
> the Florida Supreme Court's holdings in *Phillips* and *Jones* that found this type of
> evaluation is not sufficient to prove deficits in current adaptive behavior. Defendant
> made no effort whatsoever to present any evidence to show that he had present
> adaptive behavior deficits occurring contemporaneously with the determination of
> his IQ.

(*Id.* at 6404).  In other words, because Arbelaez's IQ tests were administered while he was in
prison, his adaptive deficits too must be measured while he is in prison.   Rule 3.203 clearly states
that such subaverage intelligence must be existing *concurrently* with adaptive deficits.   The
Florida Supreme Court agreed with the trial court.

> Guillermo Octavio Arbelaez filed a successive post-conviction motion in which he
> raised claims based on *Atkins v. Virginia*, 536 U.S. 304 (2002). The post-conviction
> court denied the motion after an evidentiary hearing. We hereby affirm the
> post-conviction court's denial of relief. Arbelaez did not prove that he has
> concurrent deficits in adaptive behavior as required by section 921.137(1), Florida
> Statutes (2004), and Florida Rule of Criminal Procedure 3.203(b).

*Arbelaez v. State*, 72 So. 3d 745 (Fla. 2011)(unpublished opinion).    Despite its brevity, this is the
opinion to which the Court must give AEDPA deference. "It is by now abundantly clear that
AEDPA deference applies to summary dispositions of a state court, because § 2254(d) does not
require a state court to give reasons before its decision can be deemed to have been 'adjudicated on

27

the merits.'" *Bishop v. Warden*, 726 F.3d 1243 (11th Cir. 2013).  A review of Florida law both before and after the Florida Supreme Court's opinion in *Arbelaez* shows that the court was consistent in its analysis of Arbelaez's claim.

***Florida law***

In the decade or so since the inception of Florida Rule of Criminal Procedure 3.203, the Florida Supreme Court has reviewed substantive mental retardation claims made pursuant to this Rule numerous times.  *See Johnston v. Florida,* 960 So. 2d 757 (Fla. 2006);  *Rodgers v. State*, 948 So. 2d 655 (Fla. 2006); *Trotter v. State*, 932 So. 2d 1045 (Fla. 2006); *Cherry v. State*, 959 So. 2d 702 (Fla. 2007); *Burns v. State*, 944 So. 2d 234 (Fla. 2006); *Brown v. State*, 959 So. 2d 146 (Fla. 2007); *Nixon v. State*, 2 So. 3d 137 (Fla. 2009).

However, it was not until *Jones v. State*, 966 So. 2d 319 (Fla. 2007), that the Florida Supreme Court addressed this precise issue: at what point in time does one measure adaptive deficits?  Prior to *Jones*, the court had limited its discussions to the standard for subaverage intelligence.  In those cases, the State of Florida adopted a bright line rule of an IQ of 70 or below, which has now been rejected by the United States Supreme Court in *Hall*.  As the focus was on intelligence, these earlier cases had only a generalized discussion regarding adaptive deficits.  *See Cherry v. State*, 959 So. 2d 702 (Fla. 2007).  However, *Jones* transformed the generalized into a specific standard.

Since 2007, the law in Florida has been clear.  The precise issue raised by Arbelaez now was litigated in *Jones* with the respective expert witnesses asserting the same arguments as those made here by Arbelaez.  Jones' arguments were specifically rejected by the Florida Supreme Court in 2007; several years prior to the evidentiary hearing on Arbelaez's mental retardation. Accordingly, Arbelaez knew what Florida law said he must show to be successful on his claim.

28

Yet, Arbelaez proceeded to assert a virtually identical argument that was made, and rejected, in
*Jones*.

In *Jones*, the defense called Dr. Hyman Einstein.   Dr. Einstein testified that he "conducted
a 'retrospective diagnosis' to assess Jones's adaptive levels *before* age 18.   He concluded that
Jones's adaptive skill levels *as an adult* were not part of the criteria defining mental retardation."
*Jones*, 966 So. 2d at 323. (emphasis in original).   Conversely, the State's expert, Dr. Enrique
Suarez stated that "according to the applicable diagnostic manual, the inquiry into adaptive
functioning must consider present circumstances because true mental retardation is lifelong."  *Id.*
at 324.   Ultimately, the Florida Supreme Court squarely rejected the argument made by Jones,
that the intellectual functioning component is based on current testing while the adaptive deficits
inquiry is limited to behavior occurring before the age of eighteen.

> Both Florida law and our rule state that the exception to the death penalty applies to
> a defendant who "is mentally retarded" or "has mental retardation." § 921.137(2),
> Fla. Stat. (stating no person may be sentenced to death "if it is determined in
> accordance with this section that the defendant has mental retardation"); Fla.
> R.Crim. P. 3.203(e) (providing for an evidentiary hearing to consider "the issue of
> whether the defendant is mentally retarded").   Thus, the question is whether a
> defendant "is" mentally retarded, not whether he was. Both the statute and our rule
> define mental retardation as "significantly subaverage general intellectual
> functioning *existing concurrently* with deficits in adaptive behavior and manifested
> during the period from conception to age 18." § 921.137(1), Fla. Stat. (2005)
> (emphasis added); Fla. R. Crim. P. 3.203(b). Jones does not dispute that the
> intellectual functioning component must be based on current testing. Moreover, his
> own expert based his determination of this prong largely on testing administered
> between 1991 and 2005, from the time Jones was 29 to the time of the rule 3.203
> hearing. What Jones argues is that the second prong is concerned solely with an
> individual's adaptive behavior as a child under age 18. The legal definition,
> however, states that the intellectual functioning component must "exist[ ]
> concurrently with" the deficient adaptive behavior. The word "concurrent" means
> "operating or occurring at the same time." *Merriam Webster's Collegiate
> Dictionary* 239 (10th ed.2001). Jones's analysis would require us to ignore the
> plain meaning of the phrase "existing concurrently with" that links the first two
> components of the definition. The third prong— "and manifested during the period
> from conception to age 18"—specifies that the present condition of "significantly
> subaverage general intellectual functioning" and concurrent "deficits in adaptive

behavior" must have first become evident during childhood.

*Id.* at 326.   Likewise, the court rejected the alternate contention made by Arbelaez here, which is that *Atkins* prohibits a determination of an individual's current adaptive skills if that person is in prison.   *Id.* at 327.   The Florida Supreme Court found no basis for this argument.   Nonetheless, Arbelaez made these precise arguments on appeal to the Florida Supreme Court years later.   This strategy resulted in Arbelaez having presented no evidence to the trial court of adaptive deficits concurrent with his subaverage intelligence.

One year after *Jones*, the Florida Supreme Court reaffirmed that it "held retrospective diagnosis insufficient to satisfy the second prong of the mental retardation definition. We found that both the statute and the rule require significantly subaverage general intellectual functioning to exist concurrently with deficits in adaptive behavior." *Phillips v. State*, 984 So. 2d 503 (Fla. 2008)(citing *Jones*, 966 So. 2d at 325-27).

In finding that Phillips was not mentally retarded, the Florida Supreme Court did not limit its analysis to Phillips' behaviors while in prison.   After a review of Phillips' conduct both before and after the crime, the court concluded that Phillips had failed to prove adaptive deficits.   The factors the court considered were his previous employment, his functioning at home such as paying bills and household chores, his ability to cook and grocery shop.   The court also considered that the crime had been planned and Phillips engaged in a cover-up, which indicated foresight and acts of self-preservation indicating adaptive behavior.   The court also found that actions required to satisfy the cold, calculated, and premeditated aggravator are not indicative of mental retardation.   *See Atkins*, 536 U.S. at 319–20 ("Exempting the mentally retarded from [the death penalty] will not affect the 'cold calculus that precedes the decision' of other potential

murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders.").[15]   When Arbelaez asserted that the Florida Supreme Court definition of mental retardation runs afoul of *Atkins* because it "requires the application of diagnostic criteria so restrictive as to preclude a diagnosis of Mental Retardation ever being made on incarcerated individuals," he is vastly overstating the state court's analysis of *Atkins*' claims.

*Jones* and *Phillips* were followed by *Hodges v. State*, 55 So. 3d 515 (Fla. 2010).   For a third time, the Florida Supreme Court held that "subaverage intellectual functioning must exist at the same time as the adaptive deficits, and there must be current adaptive deficits." *Hodges*, 55 So. 3d at 534 (citing *Jones v. State*, 966 So. 2d 319, 326 (Fla.2007)).   Again, the court squarely rejected Hodges' argument. The court clarified that "[i]n *Jones*, we determined that the relevant inquiry under the second prong of the mental retardation standard was whether a defendant demonstrated adaptive functioning as an adult, *not whether the defendant demonstrated adaptive functioning prior to age eighteen*." *Id*. at 536 (emphasis added).   Like Phillips, the court considered Hodges' adaptive skills as an adult both before the crime and after.   For example, the court cited the fact that Hodges:

> supported himself at times by working labor jobs, such as working for Ben Thomas's masonry business. In that position, Hodges was able to mix mortar with the appropriate amount of sand, cut bricks, drive Thomas's truck, and obtain lunch for the other employees. Hodges used hydraulic lifts, gas and electric saws, masonry drills, and Thomas's credit card. Evidence also showed that Hodges supervised, albeit apparently without an official "supervisor" title, a night-shift cleaning crew.

---

[15]   Similar to *Phillips* and *Atkins*, the trial judge found that Arbelaez murdered Julio Rivas in a "cold, calculated, and premeditated manner." *See Arbelaez*, 626 So. 2d at 175.   This Court agrees that this "sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders." *Atkins*, 536 U.S. at 319-20.

*Id.* at 535.   The court also considered Hodges' level of functioning at home.   Hodges was able to cook, clean, drive, read books, care for himself and his girlfriend.   Hodges also "independently applied for food stamps and pawned items for cash."   *Id.*   Further, the court considered the "planning of the murder and cover-up" and Hodges' ability to travel independently prior "to and from work and appointments with his parole officer and from Ohio to Alabama and Florida.   On some long trips, Hodges drove without anyone instructing him on how to get to his destination. On other long trips, Hodges arranged travel by bus, including successfully arranging bus transfers along the way." *Id.*

Finally, the court again addressed the concurrent nature of adaptive deficits to subaverage intelligence in *Dufour v. State*, 69 So. 3d 235 (Fla. 2011).

> The definition in section 921.137 and Florida Rule of Criminal Procedure 3.203 states that the subaverage intellectual functioning must exist "concurrently" with adaptive deficits to satisfy the second prong of the definition, which this Court has interpreted to mean that subaverage intellectual functioning must exist at the same time as the adaptive deficits, and that there must be current adaptive deficits. *See Jones v. State*, 966 So. 2d 319, 326 (Fla. 2007).

*Dufour*, 69 So. 3d at 248. The court found that Dufour did not have adaptive deficits consistent with a person who suffers from mental retardation.  Among other things, Dufour handled the leasing of his apartment, payment of rent, administration of household chores, such as laundry, cleaning his room, cooking lunch, washing dishes, and maintaining the yard.   Dufour also exhibited daily maintenance of personal hygiene and was able to select his own apparel, dress appropriately, and independently accomplish proper hygiene activities such as brushing his teeth and showering.   Dufour was able to live independently in society as exemplified by the evidence showing that he served as an aide in an engine repair class in addition to virtually organizing and developing the curriculum for a motorcycle repair shop. Dufour also prepared and executed lesson

plans.  While incarcerated, Dufour secured a Graduate Equivalent Diploma (GED) and possessed items such as paperback books, playing cards, a traditional dictionary, and a Bible dictionary. *See id.* at 249.  The court considered all these factors along with Dufour's "intense drug use and deplorable home conditions which included sexual and physical abuse" and found these facts to be an alternative explanation for DuFour's adaptive behavior. *Id.* at 248.

The facts of these four cases are analogous to Arbelaez's case.  The record shows that Arbelaez came to the United States from Colombia without the direct assistance of his parents or other relatives.  Once here, Arbelaez obtained and maintained employment, utilized aliases to avoid detection by Immigration officials, operated a motor vehicle, developed relationships, learned to speak English (albeit at a moderate level), paid rent, performed household chores, and handled relatively complex job duties.  At the time of the crime, Arbelaez purposefully planned the murder as an act of revenge.  Arbelaez notified friends that he was about to do something bad in an effort to make sure that his former girlfriend would never forget him.  He then, purposefully, drove over the bridge to Key Biscayne and raised the hood of his car such that it appeared to be in need of repair and then threw a 5-year old child over the bridge to his death in order for the mother, who rejected his romantic desires, to suffer.  After the crime, Arbelaez drove to a friend's home, confessed, attempted to hide and destroy evidence, and borrowed money to flee the country.  When he did not have sufficient money, he returned to his friend's house by taxi, obtained more money, and returned to the airport to purchase a plane ticket to Puerto Rico using an assumed name.  Upon arrival in Puerto Rico, he contacted his family in Colombia, and requested more money to be wired to him and then fled to Colombia using his Colombian passport.  All of these facts show that Arbelaez did not have adaptive deficits consistent with an individual, who suffers from intellectual disability.  Arbelaez failed to present any testimony that he suffered significant

adaptive deficits concurrent with subaverage intelligence.   Therefore, he has not met his burden to prove that he is ineligible for execution.

Arbelaez argues the Court should not consider the time period spent in a penal institution when reviewing the concurrent adaptive deficit requirement.   Of course, all petitioners sentenced to death are presumably in a prison setting for a substantial period of time, while they attack their conviction and sentence in post-conviction proceedings.   To preclude courts from considering those petitioners' mental condition while in prison would run contrary to the case law that prohibits execution of the mentally disabled, at the time that the sentence will be carried out.

Arbelaez is before the Court on a petition for writ of habeas corpus governed by the AEDPA.   The Court's very limited role is to review the decision of the Florida Supreme Court to determine if the court made a reasonable application of clearly established federal law.   As it stands now, and as it stood when the Florida Supreme Court reached its determination, clearly established federal law left it up to the states to define intellectual disability, with the new restriction that invalidates a rigid rule prohibiting defendants from arguing that they indeed are intellectually disabled despite scoring more than 70 on an IQ test.   Arbelaez scored below 70 and was thus not barred by Florida law from presenting additional evidence of intellectual disability. He did not.   The Court is bound by this precedent.   As there is no clearly established federal law interpreting the concurrent adaptive deficit requirement to not include the period of the defendant's incarceration, the Court cannot grant Arbelaez federal habeas relief.

To reiterate, *Atkins* expressly left it for the states to develop the procedural and substantive guides for determining who is intellectually disabled.   *Bobby v. Bies*, 556 U.S. 825 (2009).   In his federal habeas petition, Arbelaez has not cited a case from the United States Supreme Court which says otherwise. Rather, Arbelaez has cited *Thomas v. Allen*, 614 F. Supp. 2d 1257 (N.D. Ala 2009)

and various academic publications on mental retardation to support his argument.   ([DE 1] at 38).

This is not clearly established federal law. Clearly established federal law is not the case law of the

lower federal courts, including this Court or even the Eleventh Circuit Court of Appeals.   Instead,

in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the

dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.' "

*Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (alteration in original) (*quoting Williams*,

529 U.S. at 362).

The Court finds the Florida Supreme Court's determination that Arbelaez was not

intellectually disabled did not violate clearly established federal law.  *See Harrington*, 131 S. Ct.

at 786 (2011) ("It is not an unreasonable application of clearly established Federal law for a state

court to decline to apply a specific legal rule that has not been squarely established by this Court."

(brackets and quotation marks omitted)).   Accordingly, habeas relief must be denied.

### The Florida Supreme Court's Factual Determination

Arbelaez's second claim for habeas relief is that he "meets the three requirements for a

diagnosis of mental retardation, notwithstanding the unconstitutional strictures placed upon him

by Fla. Stat. § 921.137 and *Jones*." ([DE 1] at 66).   In asserting this argument, Arbelaez argues in

great detail that he has "significantly sub-average intellectual functioning."   (*Id.* at 66-78).

Arbelaez also asserts that he has adaptive deficits that manifested, along with subaverage

intelligence, prior to the age of eighteen. (*Id.* at 78).   Arbelaez concedes that he must prove all

three prongs of the definition to be diagnosed with mental retardation.

As explained above, the Florida Supreme Court denied Arbelaez's claim solely on his

failure to prove that "he has concurrent deficits in adaptive behavior."  *See Arbelaez*, 72 So. 3d at

745.   The Florida Supreme Court did not discuss whether Arbelaez had proven subaverage

35

intelligence or its manifestation prior to age 18. As the test for mental retardation involves proving all three prongs, even if Arbelaez had proven the other two prongs, he cannot prevail unless he shows that the Florida Supreme Court's determination regarding adaptive deficits "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).

Arbelaez did not prove that he has "*concurrent* deficits in adaptive behavior." ([DE 1] at 78)(emphasis added). Rather, Arbelaez continues to advance the same argument made in his first claim for federal habeas relief. "In so far as the trial court omitted to consider the plethora of evidence presented as to Arbelaez's adaptive deficits *while growing up in Colombia, and in Florida*, the Florida courts' determination that Arbelaez does not meet the second prong of the definition of mental retardation amounts to an unreasonable determination of the facts." (*Id.*)(emphasis added). This single statement illustrates why Arbelaez has not met his burden. The Florida Supreme Court has held, on many occasions, that *concurrent* means at the time of the intelligence testing even if such testing was conducted while the defendant was incarcerated. *See Phillips*, 984 So. 2d at 503, *Hodges*, 55 So. 3d at 534, *Jones*, 966 So. 2d at 326, *Dufour*, 69 So. 3d at 248. Therefore, even if Arbelaez had proved that he had adaptive deficits while growing up in Colombia and during the time he lived in Florida,[16] he has not shown that the Florida Supreme Court's determination that he failed to prove *concurrent* adaptive deficits at the time of the intellectual quotient testing was an unreasonable determination of facts. Habeas relief must be denied.

### Ineffective Assistance of Counsel during the Penalty Phase

---

[16] While Arbelaez asserts that he has proven that he suffered from adaptive deficits during his formative years, the record actually contradicts that argument.

Arbelaez's third claim for relief is that he received ineffective assistance of counsel during the penalty phase of his trial. ([DE 1] at 80). Arbelaez asserts that his counsel's performance was deficient in failing to investigate and present issues regarding his mental illness and his family history of childhood abuse, neglect, and poverty.[17] The clearly established federal law applicable to claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).

### The *Strickland* Standard

Arbelaez's claim is governed by *Strickland*. Here, however, his claims are also governed by the deferential standards of the AEDPA. To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate: (1) that his counsel's performance was deficient, *i.e.*, the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 687-88. A habeas petitioner claiming ineffective assistance of counsel must succeed on both prongs of the *Strickland* test. *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001). Further, we need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

To meet the deficient performance prong of *Strickland*, the defendant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance. *Id.* at 689. Counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Id.*

---

[17]   In his state post-conviction motion, Arbelaez also asserted that his counsel's performance was ineffective for failing to investigate and present evidence of his lifelong battle with epilepsy. *See Arbelaez*, 898 So. 2d at 31. However, he did not assert that claim here.

Under *Strickland*, a petitioner pursuing a claim of ineffective assistance of counsel must also demonstrate prejudice. *Purvis v. Crosby*, 451 F.3d 734, 743 (11th Cir. 2006). Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* It is not enough for the defendant to show that the error had some conceivable effect on the outcome of the proceeding. *Id.* at 693. Rather, he must show that the result would have been different.

The Court reviews Arbelaez's claims with the clearly established federal law of *Strickland* and its progeny while also applying deference to the state court's decisions as required by the AEDPA. The Court has reviewed the record including the penalty phase testimony and the testimony given at the evidentiary hearing held during Arbelaez's post-conviction proceedings.

### *Penalty Phase*

At the penalty phase, the defense called six witnesseses for purposes of mitigation. [DE 15-31]. The defense theory for mercy was that Arbelaez is an epileptic, who had no criminal or social history of violence or drug abuse. The testimony is summarized below.

(1) Eddy Martinez is a homicide investigator for the City of Miami Police Department and was the lead investigator on the charges against Arbelaez. Detective Martinez testified that he arrested Arbelaez upon his return to the United States and that Arbelaez had no significant criminal history, other than one prior sealed arrest. (*Id.* at 17-19).

(2) Juan Landrian is a neighbor and co-worker of Arbelaez and had known him for seven or eight years prior to his conviction. Landrian testified that Arbelaez had always been a hardworking and law-abiding citizen who never drank or took narcotics, besides his prescribed medication for epilepsy. (*Id.* at 22-23).

(3) Pedro Salazar is a family friend of Arbelaez and allowed Arbelaez to live in his home for about eight months in 1987.  Salazar testified that he never saw Arbelaez take narcotics or drink alcohol and never saw him engage in any acts of violence towards anyone or engage in any type of criminal activity.  He also testified that Arbelaez was a very hard worker, working at 7-Eleven at night and painting houses, and that Arbelaez never engaged in any immoral or improper activities. (*Id.* at 27-30).

(4) Adelfa Salazar is the mother of Pedro Salazar and also lived in the home when Arbelaez spent eight months living there.  Adelfa Salazar testified that Arbelaez never betrayed her trust while living there and nothing he did concerned her about having him live with her. Like her son, she testified that Arbelaez was a hard worker and never engaged in any fights, violent discussions, or acts of violence.  She testified that Arbelaez had suffered three or four epileptic seizures while living with her, each lasting about fifteen minutes, consisting of strong convulsions, which would result in Arbelaez having a headache for a long period of time after the seizure ended. (*Id.* at 31-35).

(5) Marta Salazar is Pedro Salazar's sister, who lived with Pedro and Adelfa Salazar. Marta Salazar testified that she knew Arbelaez for four months prior to the murder.  She testified that she never saw Arbelaez engage in any type of criminal activity or in any type of immoral, antisocial, or violent behavior; he was never abusive towards her or anyone else in her presence and was very hard working. (*Id.* at 36-38).

(6)  Dr. Raul Lopez is a physician and neurologist who treated Arbelaez in early March 1984, when he was admitted to the emergency room at Mercy Hospital following an epileptic seizure.  Dr. Lopez testified that Arbelaez has been treated for seizures in Colombia and prescribed Mysoline,  an  anticonvulsive  medication.  He  further  testified  that  the

39

electroencephalogram (EEG) administered by Mercy Hospital indicated a pattern that is typical of patients, who have suffered from seizures since birth. Following his initial encounter with Arbelaez in the emergency room, Dr. Lopez saw Arbelaez on two additional occasions for follow-up consultations, one later in March 1984 and again in late November 1984. Dr. Lopez testified that the last time he had direct contact with Arbelaez was at his third appointment on November 29, 1984 and that he had no idea whether Arbelaez was taking his medication in 1988, which is the year of the murder.

After the testimony, the jury was instructed on the aggravating and mitigating factors to consider. The jury voted for death eleven to one. Following the jury recommendation, the court held a *Spencer*[18] hearing, which allows additional evidence not considered by the jury.

### *Post-Conviction Hearing*

The court followed the jury's recommendation and sentenced Arbelaez to death. Arbelaez sought post-conviction relief, which was summarily denied. Arbelaez appealed. The Florida Supreme Court remanded for an evidentiary hearing on his ineffective assistance of counsel during the penalty phase claim. *Arbelaez*, 775 So. 2d at 912-13. At the evidentiary hearing, Arbelaez called five witnesses.

(1) Reemberto Diaz, Esq., counsel at the trial a decade before this hearing, testified. Arbelaez's case was the first capital case where Diaz served as first chair. ([DE 15-49] at 57). Diaz vaguely remembered that Arbelaez had attempted suicide and may have been hospitalized in Colombia. Diaz testified that he had asked for a doctor's appointment to determine his sanity and competency to stand trial, but that he did not ask for a mental health expert during mitigation.

---

[18] A *Spencer* hearing is held in the state circuit court to allow the state and the defendant an opportunity to present additional evidence prior to sentencing or re-sentencing. *Spencer v. State*, 615 So. 2d 688 (Fla. 1988).

Diaz further testified that he could not recall why he did not call Dr. Haber during mitigation, even though Dr. Haber had performed a mental health evaluation on Arbelaez upon the request of prior trial counsel.  Diaz testified that he had asked the court for permission to bring Arbelaez's family members from Colombia to the United States.  Diaz had spoken to Arbelaez's family members about background and general information, but ultimately did not ask any of them to travel to the United States to testify on Arbelaez's behalf.

(2) Dr. Merry Haber, a clinical and forensic psychologist evaluated Arbelaez for competency prior to trial and testified that she was never contacted by Diaz.  If she had been contacted, she would have recommended a neuro-psychological evaluation, complete personality testing and background evaluation with family and educational history.  In the course of this type of investigation, she testified that she would normally spend hours with an investigator and attorney piecing together the defendant's life, but never made it that far in Arbelaez's case because she was only asked to assess competency.

(3)  Dr. Ruth Latterner conducted a neuropsychological evaluation of Arbelaez in August 1995 while he was on death row.  The tests included an IQ test, intellectual composite, memory and learning, concentration, language, visual constructive, achievement, sensory motor, and higher cognitive capacity. Dr. Latterner testified that Arbelaez was "educable mentally retarded." ([DE 15-51] at 92).

(4) Amparo Arbelaez Alvarez and (5) Luz Arbelaez Alvarez are two of Arbelaez's sisters, who traveled from Colombia to testify at the evidentiary hearing.  Both sisters' testimony was similar and consisted of recounting the verbally and physically abusive childhood endured by Arbelaez in Colombia.  Both sisters testified that trial counsel had never asked them or any other family members to travel to the United States for Arbelaez's trial, but they would have come if

41

they had been asked to.

In rebuttal, the State put on three witnesses. (1) Lisa Wiley is a psychological specialist with the Department of Corrections assigned to death row. ([DE 15-53] at 38). Her work includes assessment, counseling, case management, and referrals to the psychiatrist. She testified that she began observing Arbelaez as soon as he arrived at the Union Correctional Institution in 1992 and that she continued to participate in Arbelaez's treatment team meetings. She testified that she has consulted directly with Arbelaez approximately nine times per year. (*Id.* at 60-62). She further testified that mental retardation was never discussed during these meetings and that Arbelaez's English had improved over the years since she first met him. (*Id.* at 65).

(2) Dr. Sonia Ruiz is a licensed clinical psychologist who was asked by the State Attorney's Office to evaluate Arbelaez on November 5, 2001. ([DE 15-55] at 47). Dr. Ruiz performed the following tests during evaluation: the Ravens Progressive Matricies Standard Edition, the Bender Visual Gestalt Test, and the Minnesota Multiphasic Personality Inventory II, Spanish Version. Dr. Ruiz testified that during her evaluation of Arbelaez, she did not find any evidence of a major mental disorder or mental retardation.

(3) The State re-called trial counsel, Reemberto Diaz, as a rebuttal witness. ([DE 15-55] at 15). Diaz testified that he spoke with Arbelaez in Spanish. At no time during his conversations with Arbelaez did he seem mentally retarded or "slow". (*Id.* at 18). Diaz further testified that the only condition he came across in his investigation was epilepsy and that he had called Dr. Lopez, the treating physician from the emergency room, during the penalty phase. (*Id.* at 19). He testified that he had no recollection that prior counsel had contacted Dr. Haber. Diaz further testified that based on Dr. Castiello (the doctor who determined sanity and competency to stand trial) and Dr. Lopez's findings, he felt no other mental health experts were necessary. (*Id.* at

42

23-24).

Following the evidentiary hearing, the trial judge denied Arbelaez's motion for post-conviction relief.  Arbelaez appealed.  The Florida Supreme Court affirmed the denial of the post-conviction motion. *Arbelaez v. State*, 898 So. 2d 25 (Fla. 2005).

Arbelaez argues two sub-claims of ineffective assistance of counsel: (1) failure to present evidence of mental illness and (2) failure to present evidence of family history of abuse, neglect, and poverty.

### *(1) Mental Illness*

Arbelaez asserts that his penalty phase counsel rendered deficient performance because counsel failed to present evidence of his mental illness.  Arbelaez also contends that his counsel was ineffective because he failed to conduct an investigation into possible mitigation evidence. The Florida Supreme Court agreed, but found no prejudice in view of the Petitioner's planning and motive to commit the crime as well as the extensive nature of his flight to avoid detention.  While the Florida Supreme Court found that counsel's performance was deficient, Arbelaez must also show prejudice to prevail on his claim.  This Court need not expound on the deficiency prong because the claim is resolved on the prejudice prong.  *See Hall v. Head*, 310 F.3d 683, 699 (11th Cir. 2002) ( "[A]lthough there is evidence in the record to support the district court's finding of deficient performance, we need not and do not 'reach the performance prong of the ineffective assistance test [because we are] convinced that the prejudice prong cannot be satisfied.'"). The Florida Supreme Court concluded that Arbelaez had failed to show prejudice.  Arbelaez argues that the Florida Supreme Court unreasonably applied *Strickland* when it concluded that Arbelaez was not prejudiced by his counsel's failure to investigate and present evidence of mental illness. (*See* [DE 1] at 97-100).   The Florida Supreme Court's analysis is below

Although we conclude that counsel's performance was deficient, Arbelaez nevertheless failed to prove prejudice. Arbelaez confessed to, and was convicted of, killing a five-year-old boy to exact revenge on his former girlfriend. The trial court found that the murder was cold, calculated, and premeditated, as well as especially heinous, atrocious, or cruel. The jury recommended a death sentence by a vote of eleven to one. To undermine confidence in the outcome of his penalty phase, Arbelaez would have to present fairly strong evidence of mental health mitigation. For instance, "[w]e have held that a new sentencing hearing is warranted 'in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage.' " *Rose v. State*, 617 So. 2d 291, 295 (Fla.1993) (quoting *State v. Sireci*, 502 So. 2d 1221, 1224 (Fla.1987)). Arbelaez did not demonstrate at the evidentiary hearing that he suffers from mental retardation, organic brain damage, or any other major mental illness aside from epilepsy.

Arbelaez's strongest evidence of mental health mitigation is that he is of low intelligence (but has a high level of adaptive functioning) and that he was hospitalized with severe depression before moving to the United States (but was never treated or hospitalized for depression during the decade before the murder). This evidence is not strong enough to shake our confidence in the outcome. Arbelaez has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Valle*, 778 So. 2d at 966.

* * *

Because Arbelaez failed to present competent, substantial evidence that he suffers from mental retardation or major mental illness, his claim now rests upon the uncontested evidence of his low intelligence and his struggles with depression in Colombia, including his suicide attempts. Arbelaez contends that this evidence might have altered the outcome of his penalty phase. We disagree. The jury heard plenty of evidence from which to arrive at a rough estimate of Arbelaez's low intelligence level. Arbelaez testified during the guilt phase of the trial and claimed that the boy's death was an accidental drowning, despite the strong physical evidence of strangulation. The State discredited Arbelaez's testimony by introducing a videotaped confession in which Arbelaez recounted the facts of the crime in detail, making it clear that the crime was both premeditated and deliberate. The jury therefore knew that Arbelaez had enough intelligence to plan and remember the details of the murder, as well as enough intelligence to concoct a patently false story to explain the boy's death. In fact, counsel appealed to the jury during the penalty phase's closing argument to reflect on what Arbelaez's testimony revealed about his intellectual limitations: "[A]sk yourself ... what was [Arbelaez's] emotional or mental age. . .. You were able to listen and observe the man describing what he said he did."

This case is comparable to *White v. State*, 664 So. 2d 242 (Fla.1995), where we stated:

> [T]rial counsel's performance was not rendered deficient by his failure to present to the jury data concerning White's low IQ as evidenced in the PSI report. The trial record contains extensive evidence documenting the deliberate nature of White's actions before, during, and after the crime. White himself took the stand and gave a detailed account of the crime and his actions.

*Id.* at 244–45.

Although we believe that expert testimony relating to Arbelaez's low intelligence would have been vastly preferable and that counsel was deficient in failing to arrange for such testimony, we are confident that the presentation of such testimony would not have changed the outcome. Given that the jury listened to Arbelaez's testimony and also heard him explain on videotape how he executed a premeditated murder of a five-year-old boy to exact revenge on his former girlfriend, we do not believe that expert testimony about Arbelaez's intellectual limitations, short of mental retardation or major mental illness, would have altered the jury's perceptions to such an extent that it would have been swayed from its nearly unanimous recommendation of death. *See Damren v. State*, 838 So. 2d 512, 517 (Fla.2003) (concluding that counsel was not ineffective in failing to present evidence of minimal brain damage, "in light of the strong [CCP, HAC, and contemporaneous violent felony] aggravating factors which were present"); *Sweet*, 810 So. 2d at 866 (concluding that mitigation evidence of the defendant's "low-average" IQ and his "personality disorder" would not "have led to the imposition of a sentence other than death, given the four strong aggravators" in the case); *Brown v. State*, 755 So. 2d 616 (Fla.2000) (concluding that mitigation evidence of the defendant's low intelligence would not have altered the outcome of the trial, given the presence of strong aggravating factors); *Haliburton v. Singletary*, 691 So. 2d 466, 471 (Fla.1997) (holding that "[i]n light of the substantial, compelling aggravation found by the trial court, there is no reasonable probability that had the mental health expert testified [to his finding of a 'strong indication of brain damage'], the outcome would have been different").

Evidence of Arbelaez's struggles in Colombia with depression would have been equally unlikely to sway the jury. Counsel for Arbelaez admitted at oral argument that Arbelaez's suicide attempts and his hospitalization for severe depression all occurred before he moved to Florida as a young man. During the more than ten years that Arbelaez spent outside of Colombia before committing murder at age 31, Arbelaez "just had everyday problems." He was neither hospitalized nor treated for depression. He held numerous jobs and, by all accounts, learned to live independently despite his intellectual limitations. This case is therefore not one in which the defendant could have shown that he was struggling with severe depression and was contemplating suicide around the time of the crime. Rather,

Arbelaez struggled with these problems during his youth, more than a decade before the crime, and apparently found a way to control them as an adult.

Again, this potential mitigation evidence is not strong enough to shake our confidence in the outcome of Arbelaez's penalty phase. Arbelaez was found to have committed a revenge murder of a young boy in a manner that was cold, calculated, and premeditated, as well as especially heinous, atrocious, or cruel. The jury recommended a sentence of death by a vote of eleven to one. Evidence that Arbelaez was hospitalized for severe depression as a youth but then did not require treatment or hospitalization for depression at any point during the decade leading up to the murder would not have been nearly enough to counterbalance the powerful aggravating factors in this case. *See Breedlove v. State*, 692 So. 2d 874, 878 (Fla.1997) (finding no prejudice because the case's strong aggravating factors would have "overwhelm[ed]" mitigation evidence of the defendant's history of drug addiction and his troubled childhood); *Tompkins v. Dugger*, 549 So. 2d 1370, 1373 (Fla.1989), cert. denied, 493 U.S. 1093, 110 S. Ct. 1170, 107 L.Ed.2d 1073 (1990) (same); *Buenoano v. Dugger*, 559 So. 2d 1116, 1119 (Fla.1990) ("In our opinion the mitigation evidence . . . in no way would be sufficient to overcome the overwhelming evidence presented against [the defendant] at trial.... We do not believe the unfortunate circumstances of Buenoano's childhood are so grave nor her emotional problems so extreme as to outweigh, under any view, the four applicable aggravating circumstances.").

*Arbelaez*, 898 So. 2d at 35-39.

To establish prejudice under *Strickland*, Arbelaez must show that, even if his attorney had performed poorly, there is a reasonable probability that the jury's recommendation of eleven to one for death and the judge's sentence of death would have been different.   In determining prejudice from failure to present mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.   To satisfy the prejudice prong, the "likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792.

At trial, the sentencing judge found that: (1) the homicide was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification; (2) the homicide was especially heinous, atrocious, or cruel; and (3) the homicide was committed while

the defendant was engaged in a kidnapping.  *Arbelaez v. State*, 626 So. 2d 169 (Fla. 1993). (footnotes omitted).  In mitigation, the court found: (1) no significant history of prior criminal activity and (2) the nonstatutory mitigating circumstance of remorse.

At the post-conviction evidentiary hearing, Arbelaez presented the court with two expert witnesses specializing in mental health issues.  Only one of the two conclusively found Arbelaez to be mentally retarded, and the state trial court discredited that testimony.  In addition, the jury and the sentencing judge found the evidence of Arbelaez's planning and premeditation of the murder to justify a death sentence.  A new jury and judge similarly make that finding.  A new jury would likely consider that Arbelaez fled the jurisdiction, made a calculated return to Colombia after having navigated various airports while using aliases, and asked relatives to wire him money.  Furthermore, Arbelaez did not seek medical treatment while in the United States for ten years, which could show that even if he had a mental illness, he was able to manage it and function such that it was not severe enough to require treatment.

It is clear that a new jury would not have found mental health a mitigating factor.  But even if it did, this Court adds this statutory mitigating factor to the two non-statutory mitigating factors that were established at trial and then reweighs those three mitigating factors against the three aggravating factors established, and finds the outcome would not change.

### (2) Family History

Arbelaez's second sub claim is that his counsel was ineffective for failing to present evidence of his family history of abuse, neglect and poverty. Arbelaez asserts that his counsel only presented the most superficial character evidence.  The Florida Supreme Court, after summarizing the evidence presented at the post-conviction hearing and the trial court's order, found that counsel's performance was not deficient on this issue.

A comparison with the U.S. Supreme Court's recent decision in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003), confirms that counsel's investigation of Arbelaez's background satisfied the constitutional requirements. In *Wiggins*, "counsel abandoned their investigation of [the defendant's] background after having acquired only a rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524, 123 S. Ct. 2527. In contrast, counsel in this case acquired more than a rudimentary knowledge of his client's background. He testified that, in preparation for trial, he knew most of the major facts about Arbelaez's troubled background. Whereas counsel in *Wiggins* "abandon[ed] their investigation at an unreasonable juncture," *id.* at 527, 123 S. Ct. 2527, counsel here never truly abandoned his investigation. Rather, he waited for either Arbelaez's family members or the Colombian government to send him any available documentation of Arbelaez's mental health history as they assured him they would. Counsel's performance was not "unreasonable under prevailing professional norms." *Valle*, 778 So. 2d at 965. The trial court was justified in concluding that counsel did not perform at a constitutionally deficient level in investigating Arbelaez's background in Colombia.

*Arbelaez*, 898 So. 2d at 40-41. Here, the Florida Supreme Court identified the clearly established federal law and applied it to the facts of Arbelaez's case. The Court does not find this application unreasonable.

At the post-conviction hearing, trial counsel testified that he had been in contact with Arbelaez's family in Colombia prior to the penalty phase. ([DE 15-49] at 63). Diaz testified that he contacted them "to see if there is anything we are going to use from them or not use." (*Id.* at 64). Diaz stated that "[w]e just spoke, just like I spoke to him about issues about his background, things like that." (*Id.* at 65). Diaz testified that Arbelaez specifically did not want his family members to come to the trial. (*Id.* at 108). Further, Diaz testified that it would have been logistically very difficult for the family to obtain travel visas. (*Id.* at 109-110). More importantly, Arbelaez made certain incriminating statements to his family members while in Colombia regarding the murder despite the fact that he later testified during the guilt phase that the child's death was an accident. His own relatives could have been used as witnesses to impeach him. Diaz testified

credibly that he thought that evidence of Arbelaez's childhood was "tricky to present" when the victim was a child. (*Id.* at 111-12).   Finally, Diaz testified that his decision to not have family members testify was made after he "thought [his] way through and planned the best approach to the jury based on [his] position before them at the time." (*Id.* at 112).   These are strategic decisions that do not warrant re-sentencing.

Considering this testimony, the Florida Supreme Court reasonably determined that Diaz did not provide deficient performance during the penalty phase of the trial.   Arbelaez asserts that this determination was unreasonable because Diaz failed "to meaningfully investigate" any of the aspects of Arbelaez's background. ([DE 1] at 103).   As a result, Arbelaez argues that "[t]he *only* details about Arbelaez's childhood that Diaz was aware of was that Arbelaez had been an altar boy, was poor, and did not have an adequate education." (*Id.* at 104)(emphasis added).   The record belies this assertion.   Diaz testified that from talking to Arbelaez's family, he learned that Arbelaez had problems with acne, he required medication to control his epilepsy, and that he had attempted suicide and was hospitalized in a mental facility in Colombia.   Therefore, it was not an unreasonable application of clearly established federal law to find that Mr. Arbelaez's case is factually different from *Wiggins v. Smith*, 539 U.S. 510 (2003).   Unlike *Wiggins*, Diaz contacted Arbelaez's family and obtained certain information beyond the records immediately available to counsel.

After review of the family's information, Diaz made the strategic determination that a different approach was needed at sentencing.   "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, but those made after less than complete investigation are reasonable only to the extent that reasonable

professional judgment supports the limitations on investigation." *Strickland*, 466 U.S. at 690–691. The Court cannot conclude that the decision of the Florida Supreme Court was unreasonable. "The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is whether some reasonable attorney could have acted in the circumstances . . . [as this attorney did]-whether what . . . [this attorney] did was within the 'wide range of reasonable professional assistance.'" *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc) (quoting *Strickland*, 466 U.S. at 689) (citation omitted); *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (stating that to show unreasonableness "a petitioner must establish that no competent counsel would have made such a choice."). Even if that determination by the Supreme Court were to be found unreasonable, upon a *de novo* review in reweighing aggravating and mitigating factors, there is little reason to expect a different outcome. Therefore, the Petitioner would have failed to show prejudice at trial or sentencing.

### Ineffective Assistance of Counsel during the Guilt Phase

Arbelaez's final claim for habeas relief is that he received ineffective assistance of counsel during the guilt phase of his trial. Arbelaez asserts that his counsel's performance was deficient in four specific areas:  1) Failure to present evidence of Arbelaez's epilepsy;  2) Failure to present expert testimony related to his epilepsy and the formulation of specific intent; 3) Failure to voir dire prospective jurors as to their attitude as to mental health issues; 4) Failure to investigate Arbelaez's mental retardation, brain damage, and cultural unfamiliarity with the American legal system such that a challenge could have been made to Arbelaez's confession. After making legal and factual determinations, the Florida Supreme Court denied this claim.  This Court finds that determination reasonable and does not grant habeas relief.

*Epilepsy*

Arbelaez asserts that his lawyer's performance was deficient for failing "to present evidence at trial that due to his well documented epilepsy, Arbelaez could not form the specific intent for first degree murder and kidnapping." ([DE 1] at 111).  This, however, is not the actual claim that Arbelaez is asserting.  While he claims that counsel's performance was deficient because he failed to present evidence, in truth, his claim is that counsel was deficient because he did not know Florida law well enough to properly object when the court disallowed the presentation of evidence of his client's epilepsy.

The record reflects that the State moved, in limine, to "limit any discussion or presentation of evidence to the jury in this case of the fact that the defendant has an illness that is sometimes described as seizure illness or epilepsy." ([DE 15-15] at 13).  Defense counsel objected and the court ruled that unless the defendant was going to take the stand, the information was not relevant. (*Id.* at 18).  Later, the trial court amended its prior ruling because it could appear to have been compelling Arbelaez to take the stand so the court advised counsel that he could raise the issue during closing argument regardless of whether Arbelaez testified. (*See* [DE 15-27] at 9-10).

Arbelaez contends that "the court apparently overlooked the applicable Florida case law at the time of Arbelaez's trial." ([DE 1] at 111).  However, even if the law in Florida was such that the trial court had erred, Arbelaez may not raise that claim here as he did not raise it in the Florida courts. Claims of trial court error must be made on direct appeal.  "When a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights." *Cone v. Bell*, 556 U.S. 449, 465 (2009)(internal citations omitted).  This argument was not made before the state court and is barred from federal habeas review. *See id.*

51

Arbelaez also argues his lawyer was unfamiliar with the applicable Florida law relating to the potential guilt phase application of Arbelaez's disability and that he "essentially surrendered the defense and represented that he only intended to call Arbelaez to shed light on his disease." ([DE 1] at 112). This is refuted by the record. Arbelaez did testify about his epilepsy and required medication at trial. Likewise, counsel argued during closing argument that Arbelaez was an epileptic who was medicated and ill. ([DE 15-29] at 21). Therefore, the factual basis for his habeas claim is unfounded.

Arbelaez's final argument is that counsel did not put on independent evidence to establish Arbelaez's condition. As the Florida Supreme Court concluded

> On the epilepsy claim, the record shows that counsel presented evidence of Arbelaez's epileptic seizures through Arbelaez's own testimony and the testimony of two of his friends. The record further shows that counsel both investigated epilepsy as a defense to negate specific intent and argued its relevance to the trial court. Moreover, even if counsel had presented additional evidence of epilepsy, there is no reasonable probability that it would have changed the outcome of the guilt phase as Arbelaez never alleged that he had a seizure on the day of the crime. He maintained that the child accidentally fell from the bridge while Arbelaez was attending to car trouble. Thus, the record conclusively rebuts this claim.

*Arbelaez*, 775 So. 2d at 913. The Court does not find that the Florida Supreme Court's determination on the deficiency prong was an unreasonable one.

Moreover, the Court does not find that the Florida Supreme Court's determination regarding prejudice was an unreasonable application of clearly established law. In his petition, Arbelaez asserted that "the Florida Supreme Court erred in imposing an erroneously high burden on Arbelaez, in concluding that no prejudice had been alleged." ([DE 1] at 112). In support, Arbelaez made the following argument:

> The Florida Supreme Court also concluded that "even if counsel had presented additional evidence of epilepsy, it would not have changed the outcome of the guilt

52

> phase, as Arbelaez never alleged that he had a seizure on the day of the crime." *Id*
> [sic] at 913.  However, the court's analysis here is flawed.  It is an unreasonable
> determination of clearly established federal law.  The correct standard is not
> whether the additional evidence "would have changed the outcome," but whether
> there is a reasonable probability that but for counsel's unprofessional errors, the
> result of the proceeding would have been different" [sic] A reasonable probability
> is a probability sufficient to undermine confidence in the outcome" [sic] *Strickland
> v. Washington*, 468 U.S. 668, 694 (1984).

([DE 1] at 112)(emphasis added).  The Court finds this argument incomplete.  Arbelaez has

edited and redacted a portion of the Florida Supreme Court's order. The redacted statement is

essential to the analysis.  Arbelaez quoted the order to say "even if counsel had presented

additional evidence of epilepsy, it would not have changed the outcome of the guilt phase, as

Arbelaez never alleged that he had a seizure on the day of the crime."   That is not what the Florida

Supreme Court's opinion says.   The order clearly and unambiguously states "even if counsel had

presented additional evidence of epilepsy, *there is no reasonable probability that* it would have

changed the outcome of the guilt phase, as Arbelaez never alleged that he had a seizure on the day

of the crime.  *Arbelaez*, 775 So. 2d at 913. (emphasis added).  The statement "*there is no

reasonable probability that*" was edited out of the quote by Arbelaez when he made his argument

to the Court.

Arbelaez's argument is an incomplete representation of the Florida Supreme Court's

opinion.   Counsel may not edit quotations from a court's order and then argue that the court

applied the wrong standard -- in particular when the quote that was redacted is the precise standard

that Arbelaez asserts was not applied in his case.  A petitioner "must show that *there is a

reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694 (emphasis added).  As the Florida

Supreme Court reasonably applied the proper standard, the reasonable probability standard

established in *Strickland*, federal habeas relief is denied.

*Expert Witnesses*

Arbelaez contends that, even though he and two lay witnesses testified during the guilt

phase about his epilepsy, counsel was deficient for failing to present an "expert or other testimony

to corroborate this testimony." ([DE 1] at 113).  In support of this claim, Arbelaez cites to

"KAPLAN & SCHLOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY V at 639."  Arbelaez requests

an evidentiary hearing on this claim.  However, Arbelaez has not met the standard to require the

Court to hold an evidentiary hearing.

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that - (A) the claim relies on - (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  An evidentiary hearing, therefore, is not barred where the failure to

develop the factual basis is attributable to the state court's refusal to provide any hearing.

However, even where a federal evidentiary hearing is not barred by a failure to develop the facts,

"it would still be appropriate to deny [a diligent petitioner] an evidentiary hearing if such a hearing

would not assist in the resolution of his claim." *Breedlove v. Moore*, 279 F.3d 952, 959-60 (11th

Cir. 2002). A federal evidentiary hearing allowing expert witnesses to corroborate the defendant's

testimony regarding his epilepsy would add nothing that would lead to a separate conclusion

regarding the Petitioner's guilt in view of his own testimony at trial that the death was an accident.

Moreover, to be entitled to an evidentiary hearing on a claim, the petitioner must proffer additional

54

evidence that, if true, would entitle him to relief. *Chandler v. McDonough*, 471 F.3d 1360, 1362-63 (11th Cir. 2006).   Arbelaez has not done so.

More importantly, in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–1400 (2011), the Supreme Court held that federal courts must first determine whether a petitioner satisfies § 2254(d) before they may consider any new evidence acquired during a federal hearing. Therefore, the Court must look at the state court record to determine, considering *only* the record before the state court, if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d)(1)-(2).   On this record, an evidentiary hearing in federal court is not warranted.

Arbelaez has not satisfied 28 U.S.C. § 2254(d)(1).   The Florida Supreme Court addressed this "sub-claim" in its decision by denying "the epilepsy claim" for failing to show deficiency or prejudice. *Arbelaez*, 775 So. 2d at 913.   This summary conclusion does not preclude the Court from applying AEDPA deference.   "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784 (citations omitted).   The denial of "the epilepsy claim" by the Florida Supreme Court was premised on the fact that the record "conclusively rebuts this claim." *Arbelaez*, 775 So. 2d at 913.   The Florida Supreme Court reasoned that because Arbelaez "maintained that the child accidentally fell from the bridge while Arbelaez was attending to car trouble" he did not need to show an inability to form specific intent. *Id.* In other words, Arbelaez testified that this was an accident. Arbelaez testified as follows: "So therefore, I opened the car hood and remained there standing.  I forgot about the kid. I was

concentrating on my problems. When, in a short while later I heard the scream and I looked and saw him floating." ([DE 15-27] at 78-79). Therefore, there was no specific intent to negate. Based on his own testimony at trial, this determination by the Florida Supreme Court was reasonable.

Because Arbelaez testified it was an accident, had counsel put on a mental-health based defense to negate specific intent, that defense lawyer would have contradicted his own client's testimony, which may have constituted ineffective assistance of counsel.   The innocence defense, as opposed to a mental health defense, was a strategic decision. Arbelaez was determined to testify, as was his right to do, ([DE 15-22] at 7), and thus it was a reasonable strategy not to pursue a mental health defense at the guilt phase of the trial.   Arbelaez's testimony that the child's death was an accident is what defense counsel had to work with when formulating a strategy and as a result, the Florida Supreme Court's determination was reasonable.

### Failure to Voir Dire on Mental Health

Arbelaez's third sub-claim for federal habeas relief is that his counsel "failed to voir dire prospective jurors as to their attitude as to mental health."   ([DE 1] at 114).   As an initial matter, this claim is insufficiently plead.   "Federal courts are authorized to dismiss summarily any habeas petition that appears legally insufficient on its face, *see* 28 U.S.C. § 2254 Rule 4."   *McFarland v. Scott,* 512 U.S. 849 (1994); *see also Spillers v. Lockhart,* 802 F.2d 1007, 1010 (8th Cir. 1986) (holding that it is proper to dismiss a petitioner's claims that do not provide "any specifics to identify precisely how his counsel failed to fulfill those obligations").   While Arbelaez lists several questions that he feels should have been asked to prospective jurors, he fails to assert any prejudice other than to simply say it was "prejudicial to his case."   ([DE 1] at 115). He concludes by arguing that "[t]he Florida court's analysis fails for the same reason as noted previously, and

amounts to an unreasonable determination of facts." (*Id.*).    Based on this vague and conclusory argument, the Court can only assume that Arbelaez meant his prior prejudice argument from the epilepsy sub-claims.   Given the insufficiency of his allegations, the Court finds that the Florida Supreme Court's denial of this claim was reasonable.   The Florida Supreme Court found no prejudice.   It stated:

> Arbelaez also claims that counsel was ineffective for failing to question prospective jurors on their views about mental illness negating the specific intent required for a finding of first-degree murder. However, as discussed above, Arbelaez never claimed that he had a seizure during the crime. Thus, even if counsel were deficient in failing to ask voir dire questions on this issue, the failure to do so resulted in no prejudice to Arbelaez and no relief is warranted on this basis. *See Strickland.*

*Arbelaez*, 775 So. 2d at 913.   The Court finds that the Florida Supreme Court's denial of this claim was reasonable.   Arbelaez took the stand in his own defense and testified that the 5-year old Julio Rivas, fell off the bridge. ([DE 15-27] at 79).   Counsel cannot be deemed deficient for failing to voir dire the jurors on a defense that was not asserted at trial at the defendant's choosing.

### *Miranda Waiver*

Arbelaez's final sub-claim is that his counsel was ineffective for failing to investigate mental retardation, brain damage, and cultural unfamiliarity so that counsel could challenge the voluntariness of Arbelaez's confession. ([DE 1] at 115).   Arbelaez mentions that the "Florida courts refused to grant an evidentiary hearing on this issue, asserting that there was no evidence of Arbelaez's low intelligence in the record." (*Id.* at 115).   This is not correct.   The Florida Supreme Court denied the claim as follows:

> We further agree with the trial court that Arbelaez was not entitled to an evidentiary hearing on his claim that trial counsel rendered ineffective assistance as to the *Miranda* waiver issue. In summarily denying relief, the trial court noted the following: defense counsel did file a motion to suppress Arbelaez's statements and litigated the issue at a hearing; the claim of low intelligence was not supported by the record in that Arbelaez's conversations and statements to the police and his

testimony at trial demonstrated that he had no difficulty assimilating information and that he clearly understood the rights he was waiving; and Arbelaez did not articulate why he was incapable of voluntarily waiving *Miranda* because he was from Colombia.FN2 We note, moreover, that we previously determined that Arbelaez "voluntarily waived his constitutional rights." *Arbelaez*, 626 So. 2d at 175. Thus, Arbelaez established neither deficient performance nor prejudice as required by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

> FN2. Arbelaez was advised of his rights in Spanish and there was no claim of a language barrier

*Arbelaez*, 775 So. 2d at 914.   As is apparent from the opinion, the Florida Supreme Court denied this claim in greater detail and with more analysis than Arbelaez indicates in his petition.   The Florida Supreme Court considered both deficiency and prejudice when denying this claim.   This Court must give AEDPA deference to these determinations.

Petitioner challenges the factual determination by the Florida Supreme Court that there was "no evidence in the record" of his low intelligence. First, the opinion is clear. The Florida Supreme Court did not determine that there was no evidence.   The court stated that his claim of low intelligence "was not supported by the record." *Arbelaez*, 775 So. 2d at 914.   The court reached this conclusion based on the evidence at trial, including Arbelaez's testimony at trial and conversations and statements made to the police.   Of course, evidence taken at the 2002 and 2009 post-conviction evidentiary hearings, did not factor into the Florida Supreme Court's determination because both of those hearings did not occur until years *after* the opinion was final. Therefore, at the time that the Florida Supreme Court denied this claim there was no evidence *in the record* of Arbelaez's low intelligence.   Section 2254(d)(2) provides habeas relief only if the state court's determination of the facts was unreasonable.   It was not.

Accordingly, after due consideration, it is

58

**ORDERED AND ADJUDGED** that Petitioner Guillermo Arbelaez's Petition for Writ of Habeas Corpus by a Person in State Custody is **DENIED** and a Certificate of Appealability is **GRANTED** on the claims of ineffective assistance of counsel at the sentencing phase of trial, in view of the sentence of death imposed in this case.

**DONE AND ORDERED** in Chambers at Miami, Florida this 20th day of August, 2014.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies Provided:
Counsel of Record

59